STATE OF NORTH CAROLINA ex rel. UTILITIES COMMISSION; AND DUKE POWER COMPANY (APPLICANT) v. PUBLIC STAFF, NORTH CAROLINA UTILITIES COMMISSION (APPELLANT) AND LACY H. THORNBURG, ATTORNEY GENERAL; AND CITY OF DURHAM (CROSS-APPELLANTS)

No. 416A89

(Filed 22 April 1992)

1. **Utilities Commission § 41 (NCI3d) — power company rates — rate of return on common equity — increment for future stock issuance costs — absence of support in record**

    The Utilities Commission's inclusion of a 0.1% increment in a power company's rate of return on common equity to cover future financing, or stock issuance, costs was not supported by substantial evidence in view of the whole record where there was no evidence that the company intended to issue stock in the near future.

    **Am Jur 2d, Public Utilities §§ 133, 189-193.**

2. **Utilities Commission § 41 (NCI3d) — power company rates — rate of return on common equity — improper considerations**

    The Utilities Commission's approved rate of return of 13.2% on Duke Power Company's common equity was affected by improper considerations and not otherwise supported by substantial evidence in the record as a whole where the only evidence in the record supporting a rate of return higher than 13% was an unreliable risk premium study; the Commission improperly considered the rates of return on equity allowed AT&T by the Commission and allowed electric utilities in five

other states by their state regulatory commissions when there was nothing in the record to show that the equity return requirement for any of those utilities was comparable to that of Duke; the Commission was improperly concerned about an "extreme fluctuation" between the rate of return allowed in Duke's last general rate case and that allowed in the present case; and the Commission improperly considered the effect of leveling costs Duke will incur from payments Duke makes to owners of the Catawba Nuclear Station.

**Am Jur 2d, Public Utilities §§ 133, 189-193.**

Justice LAKE did not participate in the consideration or decision of this case.

APPEAL pursuant to N.C.G.S. § 7A-29(b) from a final order of the North Carolina Utilities Commission entered 10 March 1989. Heard in the Supreme Court 9 April 1990.

*Duke Power Company, by Steve C. Griffith, Jr., Senior Vice President and General Counsel; Ellen T. Ruff, Deputy General Counsel; and Ronald L. Gibson, Associate General Counsel; and Kennedy Covington Lobdell & Hickman, by Clarence W. Walker and Myles E. Standish, for applicant-appellee Duke Power Company.*

*Public Staff, by James D. Little and David T. Drooz, Staff Attorneys, for appellant Public Staff.*

*Lacy H. Thornburg, Attorney General, by Karen E. Long, Assistant Attorney General, and City of Durham, by W. I. Thornton, Jr., City Attorney, and Carolyn J. Joyner, Assistant City Attorney, for cross-appellants.*

EXUM, Chief Justice.

This is the second appeal from the Commission's order granting a rate increase to Duke Power Company (Duke). On the first appeal, *State ex rel. Utilities Comm. v. Public Staff*, 322 N.C. 689, 370 S.E.2d 567 (1988), this Court held the Commission failed to include in its order "material factual findings sufficient in detail to permit meaningful review of its conclusion that 13.4% is a fair return on common equity." 322 N.C. at 699, 370 S.E.2d at 573. More specifically, the Court held that required factual findings were missing on the extent to which the Commission included

STATE ex rel. UTILITIES COMM. v. PUBLIC STAFF

[331 N.C. 215 (1992)]

in its approved rate of return on common equity an increment designed to cover purported future financing, or stock issuance, costs (costs of issuing common stock) and whether and to what extent it included an increment to protect Duke's shareholders against dilution of their investment should Duke be required, during unfavorable market conditions, to issue common stock below book value. Duke's witness, Dr. Charles Olson, referred to these increments, respectively, as "financing costs" and "down-market" adjustments to what would otherwise be an appropriate equity rate of return. We concluded that the Commission erred in approving a 13.4% rate of return on common equity, in part because it omitted these findings.

In addition to directing the Commission on remand "to support its conclusion on [the proper rate of return on common equity] with specific findings as to its treatment of financing costs and down market protection," we charged the Commission "to reconsider the proper rate of return on Duke's common equity in light of this opinion." We said, "The Commission may make such other findings of material facts in support of its conclusion on this issue as it deems appropriate." Id. at 701, 370 S.E.2d at 574. We now examine whether in its new order on remand underlying evidence supports the findings and the findings support the Commission's revised conclusion regarding the appropriate rate of return on Duke's common equity.

On remand, the Commission reassessed the evidence and issued new findings of fact and conclusions. It concluded 13.2% was a fair rate of return on Duke's common equity. The Commission's new order makes clear that there is no increment included in the new rate of return for protection of shareholders against stock issuance in "down-market" conditions. It also makes clear that there is a 0.1% increment in the new rate of return to cover future financing, or stock issuance, costs. The Commission's new order provides the necessary specificity lacking in its previous order with regard to these increments. We are now in a position to review (1) whether the Commission erred in including the 0.1% increment in its approved 13.2% rate of return on common equity and (2) whether this approved rate of return is supported by "material factual findings sufficient in detail to permit meaningful appellate review of its conclusion." State ex rel. Utilities Comm. v. Public Staff, 322 N.C. at 699, 370 S.E.2d at 573.

STATE ex rel. UTILITIES COMM. v. PUBLIC STAFF

[331 N.C. 215 (1992)]

We now hold that the Commission's inclusion of this "stock issuance" increment is not supported by substantial evidence in view of the whole record. Further, we hold the whole record fails to support the Commission's approved rate of return of 13.2% on Duke's common equity. For these reasons, we vacate the Commission's order setting a 13.2% rate of return on common equity and remand the matter to the Commission for further proceedings consistent with this opinion.

I.

The evidence presented to the Commission in hearings held between 3 September and 24 September 1986 is detailed in *State ex rel. Utilities Comm. v. Public Staff*, 322 N.C. at 693-98, 370 S.E.2d at 570-72. This evidence includes the prefiled testimony and updated oral testimony of three expert witnesses. Briefly summarized:

Dr. Charles E. Olson presented the results of a Duke-specific DCF (discount cash flow methodology) study,[1] which indicated to him a return requirement of 11.9% to 12.4%. To this recommended rate of return Dr. Olson made two upward adjustments: one for future financing costs and one for possible future "down-market" conditions. Dr. Olson valued each adjustment at 0.5%, for a total upward adjustment of 1.0%. Dr. Olson "checked" these results with two other studies — a DCF study of comparable electric utilities and a "risk premium study."[2] These suggested return requirements of 12.5% to 13% and 13.85%, respectively, also factored upward for financing costs and "down-market" considerations. After making some other adjustments to the return suggested by his Duke-specific DCF study, he ultimately recommended a rate of return on equity between 13.5% and 14.0%.

Public Staff witness George T. Sessoms also presented a Duke-specific DCF study, which indicated an investor return of 11.5% to 12.3%. This was supplemented by a DCF study of comparable utilities, which suggested a 12.0% to 12.9% investor return requirement. Together, these figures supported an investor return requirement of 12.3%, which included a weighted average financing

---

1. This method determines the proper rate of return by adding to the common stock's current yield a rate of increase investors expect to occur over time. *State ex rel. Utilities Comm. v. Public Staff*, 322 N.C. at 693-94, 370 S.E.2d at 570.

2. See n. 5, *infra*, for an explanation of this study.

expense factor of 0.1%, based upon Duke's actual, historical costs of issuing new common equity shares between 1976 and 1985.

The Attorney General's witness, Dr. John W. Wilson, recommended a return for common equity of 11%, based on a DCF model that includes the historical growth rates of seventy-nine electric utilities, including Duke. He made no adjustment for stock issuance costs.

The Commission originally concluded Duke should be permitted a 13.4% rate of return on its common equity. The Commission recited the testimony of witnesses Olson, Sessoms, and Wilson in support of this conclusion. The Commission said the rate of return included some increment for financing costs, but it did not quantify this increment; and it did not state whether the 13.4% figure included a "down-market" increment.

On the first appeal this Court noted the Commission's approved 13.4% rate of return was identical to the return suggested by Dr. Olson's Duke-specific DCF study (12.4%) upwardly adjusted 1.0% for financing costs and "down-markets." We further noted the absence of any indication whether the Commission included a down-market increment in that rate of return. We approved Chairman Wells' observation that "ordinarily 'it is not the responsibility of the ratepayers to protect investors from swings in the marketplace,'" id. at 699, 370 S.E.2d at 573, and expressly disapproved inflating rate of return estimates with "down-market" increments. We also questioned the Commission's failure to quantify the financing costs increment which it concededly had used in its approved rate of return. Prompted by the statement of Duke's chairman, Mr. Lee, that "the company's 'present expectation is that we will be back into the capital markets for new funds in about three to four years,'" id. at 700, 370 S.E.2d at 574, the only evidence in the record on the probability of Duke's issuing new stock, we noted the record included no evidence that Duke would issue any new stock sooner than three or four years from the time of the hearing. We then said:

> [T]he record reveals that both Dr. Olson, testifying for Duke, and Mr. Sessoms, for the Public Staff, adjusted the rate of return derived from their DCF studies to account for future financing costs. The adjustments they suggested, however, .5% and .1% respectively, differ widely and amount to a significant difference to ratepayers. A .5% financing cost adjustment will

220　　　IN THE SUPREME COURT

STATE ex rel. UTILITIES COMM. v. PUBLIC STAFF

[331 N.C. 215 (1992)]

increase rates by $21.2 million annually, while a .1% increase will cost ratepayers only $4.2 million annually.

We find nothing in the record which supports a $21.2 million annual adjustment for financing costs. The record shows that over the entire period of 1975-1985 the total cost of Duke's new stock issues was only $16.1 million. The average cost per issue was approximately $3.2 million. The only reference in the record to Duke's plans to issue stock in the future was the statement of its Chairman, Mr. Lee, that the company's "present expectation is that we will be back into the capital markets for new funds in about three or four years."

*Id.* at 701, 370 S.E.2d at 574.

On remand, the Commission rectified its error of law with regard to the inclusion of a down-market factor. The Commission stated this factor had not affected the 13.4% rate approved in its original order and did not affect the 13.2% revised rate. The Commission also revealed in its new order that its originally approved rate of return on common equity of 13.4% "erroneously included and reflected an allowance for financing costs of up to 0.3%." The Commission stated:

> The record in this case will not support a financing cost or issuance adjustment in excess of 0.1%. We base our decision to allow an adjustment of 0.1% on the testimony of Public Staff witness Sessoms concerning his calculation and use of a weighted average selling expense factor of 0.1%.

The Commission acknowledged this Court's observation that a 0.1% financing cost adjustment would provide annual revenues that would "more than compensate investors for the cost of issuance of new common stock," *id.*, and concluded that the adjustment on equity rate of return for future stock issuance costs should be no more than 0.1%. It accordingly revised its authorized rate of return on equity downward by 0.2% to 13.2%.

The Commission's findings are conclusive if supported by substantial evidence in view of the whole record, N.C.G.S. § 62-94 (1989), and not affected by an error of law, *Utilities Comm. v. Telephone Co.*, 281 N.C. 318, 360, 189 S.E.2d 705, 732 (1972). Such findings so supported provide the basis for the exercise of the Commission's expert judgment.

STATE EX REL. UTILITIES COMM. v. PUBLIC STAFF

[331 N.C. 215 (1992)]

## II.

[1]   We first conclude the Commission's inclusion of a 0.1% incre-
ment for purported future financing costs in its approved rate
of return on common equity, notwithstanding the testimony of Mr.
Sessoms, is not based upon substantial evidence in view of the
whole record. On the first appeal of this case, we questioned whether
the record supported *any* adjustment whatever in the rate of return
for purported future stock issuance, or financing, costs.[3] We
said:

> Since *no* evidence was introduced that Duke intends to issue
> new stock for the next three or four years, and because there
> was *no* evidence regarding the probable cost of a prospective
> issuance, we question whether the record supports *any* financ-
> ing cost adjustment.

*State ex rel. Utilities Comm. v. Public Staff*, 322 N.C. at 700,
370 S.E.2d at 574 (emphasis added). We are now satisfied, for the
reasons alluded to in our first opinion, that the record supports
no such adjustment in the common equity rate of return.

Inclusion of such an adjustment, on this record, violates the
statutory requisite that "the Commission shall fix such a rate of
return . . . as will enable the public utility by sound management
to produce a fair return for its shareholders, considering changing
economic conditions and other factors, *as they then exist.*" N.C.G.S.
§ 62-133(a)(4) (1989). Mr. Sessoms did recommend a 0.1% upward
increment in the return on equity, apparently basing this increment
on what he found to be Duke's historical stock issuance cost, the
frequency of these past issuances and the assumption that such
issuances would probably occur at some time in the future. Duke's
Chairman, Mr. Lee, however, made it clear that Duke had no "pres-
ent expectation" to issue capital stock in the immediate future.
As we noted on the first appeal, a 0.1% upward increment in
Duke's rate of return on common equity costs ratepayers $4.2 million
annually in additional rates. Historically, Duke's average costs per
issuance of stock was $3.2 million. In light of the whole record
on this issue, particularly the absence of any evidence that Duke
intended to issue stock in the immediate future, there is simply
no substantial evidentiary support for the Commission's addition

---

3. Dr. Wilson's recommended rate of return of 11%, for example, included no
adjustment for this factor.

of a 0.1% increment to Duke's rate of return on common equity to cover future stock issuance costs.[4]

## III.

[2] Second, we conclude the rate of return on Duke's common equity approved by the Commission, even absent adjustments for "down-market" and stock issuance costs, is not supported by substantial evidence in the record as a whole.

The Utilities Commission is charged by statute to fix such a rate of return on the cost of a utility's property

> as will enable the public utility by sound management to produce a fair return for its shareholders, considering changing economic conditions and other factors, as they then exist, to maintain its facilities and services in accordance with the reasonable requirements of its customers in the territory covered by its franchise, and to compete in the market for capital funds on terms which are reasonable and which are fair to its customers and to its existing investors.

N.C.G.S. § 62-133(b)(4) (1989). *See also State ex rel. Utilities Comm. v. Public Staff*, 322 N.C. at 697, 370 S.E.2d at 572. This Court has emphasized that "the primary purpose of Chapter 62 of the General Statutes is not to guarantee to the stockholders of a public utility constant growth in the value of and in the dividend yield of their investment, but is to assure the public of adequate service at a reasonable charge." *State ex rel. Utilities Comm. v. General Telephone Co.*, 285 N.C. 671, 680, 208 S.E.2d 681, 687 (1974). The legislative intent of these provisions is that the Commission "fix rates as low as may be reasonably consistent with the requirements of the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States, those of the State Constitution, Art. I, § 19, being the same in this respect." *State ex rel. Utilities Comm. v. Duke Power Co.*, 285 N.C. 377, 388, 206 S.E.2d 269, 276 (1974).

The rate of return on common equity is one of several components the Commission must consider in determining an appropriate overall rate of return for a utility. Among these components, however,

---

4. It is not necessary on this appeal for us to consider the interesting question whether the costs of issuing stock should be included as an operating expense rather than as an adjustment to the annual rate of return on common equity.

this rate of return is "the most difficult to determine and becomes . . . essentially a matter of judgment based on a number of factual considerations which vary from case to case." 322 N.C. at 697, 370 S.E.2d at 572. This determination is extremely important because "it is the most expensive form of capital accumulation, which expense is ultimately borne by the rate payer, and it is the most heavily weighted in arriving at the overall return." *Id.* at 697-98, 370 S.E.2d 572. For these reasons, the evidentiary underpinning for the Commission's findings and whether the findings support its conclusion regarding this figure is critical to this Court's review.

Both the Commission's original order and its order on remand disavow its reliance on any particular study or formula in its determination of an appropriate rate of return on common equity. In support of its conclusion that an appropriate rate of return on equity is 13.2%, the Commission cites the same evidence it summarized in its original order (summarized except where quoted):

1. The DCF studies of witnesses Olson, Sessoms, and Wilson. This methodology is "no more than a guide or channel to aid" the Commission's "informed judgment." "Market prices are only one of the many factors which should bear on the Commission's final judgment as to the fair rate of return." The Commission noted recommendations based on these DCF studies varied widely, reflecting the wild fluctuation of stock prices in 1986. In discounting the value of these studies, the Commission stated: "When the mechanical application of arithmetic models produces results which fail to comport with experience and common sense, the judgment of the Commission becomes paramount." This judgment is aided by such evidence in the record as testimony regarding takeover speculation, which distorted the price of Duke's stock in 1986.

2. Dr. Olson's risk premium methodology, which produced a 13.75% rate of return before adjustment for issuance costs and down markets.[5]

3. The average return on equity allowed by five other state regulatory commissions to five electric utilities of 14.47%.

---

5. This study was based on the premium equity capital received over long-term bond rates· during 1974-1979. The Commission explained in its order that this data is useful because the premium equity investors require is based on the level of long-term interest rates, and, at the time of the hearing, long-term interest rates were comparable to interest rates prevailing during 1974-1979, rather than to interest rates prevailing subsequent to that period.

224      IN THE SUPREME COURT

STATE ex rel. UTILITIES COMM. v. PUBLIC STAFF

[331 N.C. 215 (1992)]

4. The 15% rate of return on common equity allowed by the Commission in July 1986 to AT&T Communications of the Southern States, Inc. [hereinafter AT&T].

5. A return of 14.5% recently allowed by the Virginia Corporation Commission to the Virginia Electric and Power Company, a utility comparable to Duke "in many respects."

Other factors affecting the Commission's conclusion included the Commission's "opinion that as a general rule there should not be extreme fluctuations in the allowed return on common equity in fixing the rate of return." A difference of 170 basis points[6] between the 14.9% rate of return allowed in Duke's last rate case one year earlier and its allowed rate on remand of 13.2% "comes even closer to being an extreme adjustment" than the initial reduction of 150 basis points in the Commission's original order. The Commission also cited the effect of leveling the costs Duke will incur from payments Duke makes to owners of the Catawba Nuclear Station, saying this "somewhat increased Duke's risk by requiring Duke to defer collection of substantial revenues."[7]

The Public Staff argues that when the "down-market" and stock issuance increments are eliminated from the recommendations of the expert witnesses Olson, Sessoms, and Wilson, there is no "competent, material and substantial evidence in view of the entire record as submitted," N.C.G.S. § 62-94(b)(5) (1989), supporting the Commission's approved rate of return on common equity of 13.2%. We agree. Under this standard of judicial review the court may not sustain the Commission's findings because there is evidence in the record to support them; we must

> take into account whatever in the record fairly detracts from the weight of the [Commission's] evidence. Under the whole evidence rule, the court may not consider the evidence which in and of itself justifies the [Commission's] result, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn.

---

6. One hundred basis points represent one percentage point.

7. In lieu of permitting Duke to recover costs of buying back capacity and energy from Catawba purchasers in current rates as payments are made, the Commission decided to "levelize" certain components of these costs in order to stabilize the expenses over time and to avoid "rate shock" to present customers. *See State ex rel. Utilities Comm. v. Eddleman*, 320 N.C. 344, 378-79, 358 S.E.2d 339, 360-61 (1987).

*Thompson v. Board of Education*, 292 N.C. 406, 410, 233 S.E.2d 538, 541 (1977).

Viewing the record as a whole, we conclude, first, that certain findings supporting the 13.2% rate of return allowed by the Commission are not supported by the evidence; second, some findings, although supported by evidence, are not proper considerations in determining rates of return and do not support the rate of return conclusion. *See State ex rel. Utilities Comm. v. Public Staff*, 322 N.C. at 703, 370 S.E.2d at 576 (Court must determine whether there is substantial evidence, in view of the entire record, to support the Commission's findings, which, in turn, must support its conclusion).

The only evidence in the record supporting a rate of return higher than 13% is Dr. Olson's risk premium study, which suggested a rate of return of 13.75%. Its reliability is drawn into question, however, by Dr. Olson's own testimony that this study, which he used merely as a "check" on his DCF studies, was "not as good as the DCF." This evidence, in light of evidence to the contrary, is insufficient under the whole record test to support the rate of return approved by the Commission.

The rates of return on equity allowed AT&T by the Commission and allowed electric utilities in five other states by their state regulatory commissions similarly fail to support the Commission's findings because there is nothing in the record to show that the equity return requirement for any of these utilities is comparable to Duke's.

The Commission's concern about an "extreme fluctuation" between the rate of return allowed in Duke's last general rate case and that allowed here, termed "gradualism" by Chairman Wells, while based on fact, is an improper consideration in determining rate of return. It has nothing to do with the Company's *existing* cost of equity. *See* N.C.G.S. § 62-133(b)(4) (1989). It appears, like "down-market" factors, to arise from the Commission's inappropriate desire "to protect investors from swings in market prices." 322 N.C. at 699, 370 S.E.2d at 573.

The Commission's projection that leveling costs Duke will incur from payments to owners of the Catawba Nuclear Station will increase Duke's risk by compelling a deferred collection of revenue has no basis in the factual record. Whatever the risk, it is included

STATE ex rel. UTILITIES COMM. v. PUBLIC STAFF

[331 N.C. 215 (1992)]

in the levelized payments; and it is a known risk, ordered in Duke's previous rate case, so the market has already accounted for it in pricing Duke's stock. Thus it is accounted for in the witnesses' DCF models, which incorporate market price. At the very least, as Commissioner Cook points out in her dissent, "[i]t is not a certainty whether Duke's risk is in fact increased at all." There is no testimony and no other evidence that Duke's risk has been increased by the levelized payments.

We hold the Commission's judgment in determining an allowed rate of return on Duke's common equity of 13.2% was affected by improper considerations and is not otherwise supported by "competent, material and substantial evidence in view of the entire record as submitted." N.C.G.S. § 62-94(b)(5) (1989).

Our cases have recognized that the Utilities Commission is accorded some latitude generally in the exercise of its expertise and judgment in setting rates for regulated industries. *See, e.g.,* *Utilities Comm. v. Telephone Co.,* 281 N.C. 318, 371, 189 S.E.2d 705, 739 (1972). Nothing we do here is intended to impinge on this doctrine. Neither the Commission nor this Court, however, operates in unfenced fields. Both are bound by the evidence before us. In this case we simply conclude, for the reasons stated, that in setting the rate of return on Duke's common equity the Commission went beyond the boundaries established by the evidence.

The Commission's order insofar as it authorizes a rate of return of 13.2% on Duke's common equity is, for the reasons given, vacated. The case is remanded to the Commission for further proceedings consistent with this opinion.

Vacated and remanded.

Justice LAKE did not participate in the consideration or decision of this case.