PER CURIAM.
We have on appeal a decision by the Florida Public Service Commission relating to rates or service of telephone utilities. We have jurisdiction. Art. V, § 3(b)(2), Fla. Const.; § 364.381, Fla.Stat. (1993).
In 1992, GTE Florida Incorporated asked the Public Service Commission (PSC) to approve a telephone rate increase in gross annual revenues of $110,997,618, later revised downward to $65,994,207. After hearings, the PSC denied the request and reduced revenues by about $14,500,000.
GTE Florida filed a motion for reconsideration. The PSC took up the motion in a meeting lasting less than an hour. At this point the PSC decreased the negative revenue requirement by about $831,000 to $13,-500,000.
Ten million dollars of the total reduction arose from GTE’s use of Statement of Financial Accounting Standards 106 (“SFAS 106”), which embodied expenses GTE Florida claimed in connection with certain post-retirement benefits. GTE contended that the $10,000,000 reduction was improperly based on the PSC’s unsupported opinion of GTE Florida’s 1994 financial conditions, rather than the established 1992 test year and the 1993 rate year contained in the record.
The PSC disallowed some of the cost of services supplied by GTE Data Services, an affiliate of GTE Florida. As grounds, the PSC held that the transaction with the affiliate was not “arms length” and therefore was subject to greater scrutiny. Specifically, the affiliate would only be entitled to cost plus a reasonable return, which was set at 11.25 percent. The evidence showed, however, that GTE Data Services charged GTE Florida rates equal to or less than those charged to nonaffiliates.
The cost of supplies purchased from GTE Supply was disallowed for the same reason. The PSC found that the relationship with GTE Supply provided substantial benefits, however, and allowed a greater return to GTE Supply. The evidence showed that GTE Supply sold commodities to GTE Florida at a discount of about 2.5 to 3 percent lower than the cost to nonaffiliates.
The PSC also based its order on a calculation of GTE Florida’s capital structure, which the corporation disputes. The calculation involved a wholly owned subsidiary, GTE Communications, which sells deregulated offerings. The PSC reduced GTE Florida’s capital structure by 100 percent of the equity value of GTE Communications. GTE Florida contended that the reduction should have been adjusted to represent proportionately its own sources of capital, which include forms of debt such as bonds.
Regarding SFAS 106, our research has disclosed that this relatively new accounting standard[1] has created some confusion throughout the nation. In simple terms, SFAS 106 establishes a new “accrual” method of accounting for costs associated with post-retirement benefits other than pensions *547 (PBOPs), replacing the earlier “pay-as-you-go” accounting method. Under the accrual method, PBOP costs are deemed “paid” for financial accounting purposes as each employee earns them rather than when the PBOPs are actually paid to employees after retirement. Thus, SFAS 106 essentially is a change in the timing at which PBOP costs are used to offset company profits for accounting purposes. However, this change can have dramatic results: In 1991, International Business Machines’ switch to SFAS 106 had an estimated accounting effect of $2.26 billion. Reva Steinberg et al., Accounting for Post-Retirement Benefits: Part II, 8 Prentice Hall Insights 29 (1991).
SFAS 106 has generated diverse responses by ratemaking authorities throughout the nation. Some such authorities apparently have adopted the accrual method of accounting for ratemaking purposes with little if any change. E.g., Iowa Adopts Accrual Method for PBOPs, 131 Pub.Util.Fort. 51 (1993). Other jurisdictions have rejected it in whole or in part. E.g., Arizona Sticks with Cash Accounting, 132 Pub.Util.Fort. 54 (1994). This apparently includes the Federal Communications Commission in at least one case involving telephone carriers. FCC Rejects PBOP Accounting Change, 131 Pub.Util. Fort. 60 (1993).
Still other jurisdictions have permitted some utilities to fully recover SFAS 106 costs, while requiring other utilities to “phase in” the change. Maryland PSC Keeps Its Word & Approves PBOP Phase-In, 131 Pub. Util.Fort. 44 (1993). Some state utilities commissions have announced their intention of providing greater scrutiny over costs associated with SFAS 106 because of uncertainties surrounding it, and others have stated they may adopt an accrual method different from SFAS 106. PBOP Rulings Continue, 131 Pub.Util.Fort. 46 (1993). At least one state has required a utility company to defer SFAS 106 expenses until future rate cases, in light of higher-than-usual company profits. High Earnings Cover SFAS 106 Costs, 132 Pub.Util.Fort. 46 (1994).
Partly because of the obvious confusion created by SFAS 106 in the ratemak-ing context, we cannot say we fault the PSC for exercising some degree of caution. While unsupported statements may have been made about GTE’s future earnings, we find that an independent basis supports the PSC’s determination regarding SFAS 106: the uncertainties still associated with the accrual method of accounting for PBOPs in ratemak-ing.[2] Several other jurisdictions have expressed some doubt whether SFAS 106 is even appropriate in the context of ratemak-ing. In light of these uncertainties, the PSC is well within its discretion to proceed with some caution in changing over to the accrual method for ratemaking purposes. We so hold.[3] In fact, we believe the PSC would be within its discretion to entirely reject SFAS 106 for ratemaking purposes in light of the doubts surrounding such use.[4]
We do find, however, that the PSC abused its discretion in its decision to reduce in whole or in part certain costs arising from transactions between GTE and its affiliates, GTE Data Services and GTE Supply. The evidence indicates that GTE’s costs were no greater than they would have been had GTE purchased services and supplies elsewhere. The mere fact that a utility is doing business with an affiliate does not mean that unfair or excess profits are being generated, without *548 more. Charles F. Phillips, Jr., The Regulation of Public Utilities 254-55 (1988). We believe the standard must be whether the transactions exceed the going market rate or are otherwise inherently unfair. See id. If the answer is “no,” then the PSC may not reject the utility’s position. The PSC obviously applied a different standard, and we thus must reverse the PSC’s determination of this question.
Finally, GTE complains that the PSC’s determination of GTE’s equity structure was faulty because it removed 100 percent of the value of an unregulated subsidiary, GTE Communications. GTE notes that other states in somewhat similar cases have required a pro rata reduction and have rejected 100 percent removal. E.g., State ex rel. Utilities Comm’n v. Public Staff — North Carolina Utilities Comm’n, 322 N.C. 689, 370 S.E.2d 567 (1988).
On this point, we must affirm the PSC. The PSC order in this case notes that GTE’s investment in GTE Communications has the effect of increasing the parent company’s business risk, which in turn requires an increase in its equity ratio. This means the parent’s revenue requirements will be greater. There is adequate record support for these conclusions.
Were we to allow only a pro rata reduction based on the parent’s sources of capital, this would not necessarily eliminate all of the increased costs likely to be borne by the rate payers as a result of GTE’s riskier nonregu-lated investment. Accordingly, we believe the PSC is within its discretion in ordering a 100 percent removal, to eliminate any possibility that rate payers will shoulder any portion of the cost of the nonregulated investment. As the PSC noted, rate payers should only be required to pay for the cost of the regulated enterprise: local exchange service.
The order below is affirmed in part and reversed in part, and this cause is remanded to the PSC for further actions consistent with this opinion.
It is so ordered.
GRIMES, C.J., OVERTON, SHAW, KOGAN and HARDING, JJ., and McDONALD, Senior Justice, concur.

. SFAS 106 was formally adopted by the Financial Accounting Standards Board in December 1990.

. Accordingly, we do not find any violation of the test-year standard.

. Of course, future decisions of the PSC remain reviewable as provided by law.

. We also reject GTE's argument that its constitutional rights have been violated and its property illegally confiscated. A somewhat controversial change in accounting standards hardly gives rise to a constitutional right to have the benefit of those standards in ratemaking. This especially is true since any such "right" could not possibly have existed before the standards were changed in 1990, and since other jurisdictions have completely rejected those same standards in the rate-making context. For the same reason there is no illegal "confiscation” of GTE's properly. We also do not believe that any adjustments to the accrual method in future rate cases will violate the prohibition against retroactive ratemaking provided those adjustments do not retroactively leave a utility in a worse position than was established in prior rate cases, and provided they also do not impair existing contractual obligations in a manner prohibited by constitutional law. See Southern Bell Tel. & Tel. Co. v. Florida Public Serv. Comm’n, 453 So.2d 780 (Fla.1984).