22820

Steven W. HAMM, Consumer Advocate for the State of South Carolina, Appellant v. SOUTH CAROLINA PUBLIC SERVICE COMMISSION and South Carolina Electric and Gas Company, Respondents.

(364 S. E. (2d) 455)

Supreme Court

*Consumer Advocate Steven W. Hamm, Asst. Consumer*

*Advocate Raymon E. Lark, Jr.* and *Staff Atty. F. David Butler, Dept. of Consumer Affairs,* Columbia, *for appellant.*

*Arthur G. Fusco, Sarena D. Burch, S.C. Public Service Com'n,* Columbia, *for respondent S.C. Public Service Com'n.*

*H. Simmons Tate, Jr.,* and *Belton T. Zeigler, Sinkler & Boyd Professional Ass'n;* and *Patricia T. Smith, South Carolina Elec. and Gas Co.,* Columbia, *for respondent South Carolina Elec. and Gas Co.*

Heard Oct. 6, 1987.

Decided Jan. 11, 1988.

NESS, Chief Justice:

This is an appeal by the Consumer Advocate of an Order issued by the South Carolina Public Service Commission (SCPSC) which granted South Carolina Electric and Gas Company (SCE & G) an increase in its retail electrical rates. The issues presented question the PSC's statutory authority and the manner by which these rates were determined. We affirm.

In September, 1983 SCE & G applied for a change in its rate structure to accommodate the addition of the V.C. Summer Nuclear Station into SCE & G's rate base. The Consumer Advocate was granted leave to intervene. The Commission, on March 2, 1984, issued its Order approving an increase as well as an overall return of 11.74% for electric operations and a 14.25% return on equity. The circuit court affirmed the Commission's order and findings.

The Consumer Advocate first challenges the method used by the Commission in valuing the additional and excess capacity which resulted system-wide from the addition of the Summer Station.

The Consumer Advocate argues that the PSC wrongfully determined the rate base by considering not only the value of the new construction at the Summer Nuclear Station, but also by revaluing the Company's property system-wide. SCE & G asserts there was no revaluation of existing facilities, but rather that the valuation of the Company's additional and resulting excess capacity was determined on a system-

wide basis and not just based on the cost at the newly added Summer Station.[1]

The PSC's authority to determine rate base is set forth in Section 58-27-180, S.C. Code Ann. (1976) which provides:

> The Commission may after hearing ascertain and fix the value of the whole or any part of the property of any electrical utility insofar as the same is material to the exercise of the jurisdiction of the Commission and may make revaluations from time to time and ascertain the value of all new construction, extensions and additions to the property of every electrical utility.

The plain meaning of this section gives the PSC the authority, after the hearing and if it is material to the exercise of the Commission's jurisdiction, the power to:

(1) fix the value of the whole or any part of an electric utility's property;
(2) revalue such property; and
(3) value new construction, extensions and additions of such property.

If a revaluation occurred here, it is permitted by Section 58-27-180. However, we are not persuaded that any revaluation of property occurred.

In rate cases, "[t]he Public Service Commission is recognized as the 'expert' designated by the legislature to make policy determinations regarding utility rates."[2] In its capacity as ratemaker,

> [T]he Commission sits as the trier of the facts, akin to a jury of experts. Findings of the Commission are presumptively correct under the statute quoted above. This

---

[1] Rate base is the "amount of investment on which a regulated public utility is entitled to an opportunity to earn a fair and reasonable return ... [and] represents the total investment in, or the fair value of, the used and useful property which it necessarily devotes to rendering the regulated services." *Southern Bell Telephone and Telegraph Company v. Public Service Commission*, 270 S. C. 590, 600, 244 S. E. (2d) 278, 283 (1978). "[R]ate making is not an extact science, but a legislative function involving many questions of judgment and discretion." *Parker v. S. C. Public Service Commission*, 280 S. C. 310, 312, 313 S. E. (2d) 290, 291 (1984).

[2] *Patton v. South Carolina Public Service Commission*, 280 S. C. 288, 291, 312 S. E. (2d) 257, 259 (1984).

Court has neither the expertise nor the authority to fix the rate of return to which a public utility is entitled. Even if we might have found a different rate of return to be fair and reasonable, such does not allow us to substitute our judgment for that of the Commission. Our scope of review of findings of the Commission is accordingly limited. We may not set aside an order of the Commission except on a convincing showing that it is without evidentiary support or that it is arbitrary or capricious as a matter of law.[3]

This Court is without authority to set aside an ■■ agency's judgment on a factual issue where there is evidence of record to support the agency's decision. *Lark v. Bi-Lo, Inc.,* 276 S.C. 130, 276 S.E. (2d) 304, 307 (1981). The Consumer Advocate, at oral argument on this matter, challenged this Court three times to find any evidence to support the Commission's action here. We accept Mr. Hamm's challenge and find ample evidence including that of his own witness to support the system-wide valuation of the excess capacity.

The evidence indicates that SCE & G had, system-wide, 400 MW (megawatts) of excess capacity following the addition of the V.C. Summer Nuclear Plant.[4] The value of this excess capacity was determined by the cost per megawatt as determined on a system-wide cost of production basis rather than on the cost of production at the Summer Station alone. The Consumer Advocate's own witness testified:

> You cannot ascribe the surplus [excess capacity] to any one particular plant. You simply have a surplus in total. . . . The company has a surplus in its total. I'm not saying it is any one plant that is in surplus. There is simply more capacity than the company needs to use. It would be wrong to ascribe the surplus to any one particular plant.

Tr. 224-225.

---

[3] *Southern Bell Telephone and Telegraph Company v. Public Service Commission,* 270 S. C. 590 at 597, 244 S. E. (2d) 278 at 282 (1978).

[4] There is no appeal regarding the Commission's finding that the V. C. Summer Nuclear Station was a necessary addition to SCE & G's operations nor from the fact that SCE & G had, as a result of this addition, 400 MW of excess capacity.

Moreover, there was extensive testimony on what the difference in costs were between the system-wide valuation and valuation of the V.C. Summer Plant alone. Tr. 201-210; Tr. 192-198.

Next, the Consumer Advocate argues that SCE & G ■ should not be allowed to recover depreciation expenses on all of its plant investments because this figure includes the investment that produces the 400 MW excess capacity which was deducted from the rate base. SCE & G asserts that even though a system-wide 400 MW excess capacity resulted from the addition of the Summer Station, it should be allowed depreciation on the entire system because every plant in the system is in service and is, in fact, depreciating; or, stated another way, the system that produces the 400 MW excess is the same system that is, in fact, presently producing the electricity being used by SCE & G customers.[5] Tr. 224-225, 229.

It should be noted that the PSC adopted the present rate base plan to "phase-in" the cost of the new V.C. Summer Nuclear Station. The term "phase-in" refers to the bringing into consumer rates over a period of time, the investment cost of a new generating plant to avoid a single, huge rate increase or "rate shock." Obviously, the operational capacity of a new plant cannot be "phased-in," and thus, one method to lessen the blow to the customers is to "phase-in" the cost. The objective of rate base "phase-in" plans is to prevent "rate shock" to a utility customer when a new plant is brought on line. Scotto "Post-Operational Phase-in of Utility Plant: Prolonging the Inevitable," 112 *Public Utility Fortnightly* 28, September 1, 1983. Under the "phase-in" plan, presently before this Court, there is no dispute that all of SCE & G's generating facilities are, in fact, in service and depreciating; therefore, an allowance for this depreciation has a sound basis under the facts of this case.

The Consumer Advocate, as an alternative, argues that the Commission by utilizing the "averaging" or "system-wide" method, revalued properties and found portions of them to be presently not "used and useful" and therefore not

---

[5] A simple analogy of this is a fire station. Although the fire trucks and equipment are only used on occasion, they are, nonetheless, constantly available for use and therefore depreciating.

properly included in rate base, but at the same time allowed depreciation on this excess generating capacity. We disagree. The Consumer Advocate bases this argument on the accounting method employed by the Commission in reaching the bottom line rate base, and the wording of the Commission's finding as to rate base. The Commission found:

> That a reasonable original cost retail electric rate base used and useful, consisting of the components set forth in Section VI of this Order, as adjusted, in Table B, is $1,437,078,153.00 and said rate base should be adopted for the ratemaking purposes herein.[6]

As the Commission stated, the rate base, used and useful, consists *of the components* in Table B, which include the excess capacity in its calculations. There is no finding here that the excess generating capacity is not "used and useful."

The Commission determined the value of the gross plant in service by adding the company's book value of its existing plant in service with the book value of the V.C. Summer Station and then deducting accumulated depreciation. Tr. 11, 113.[7] There is no appeal of this finding by the Commission or its methodology. It is this "grossplant" value upon which the Commission allowed depreciation.

> A depreciation rate is, . . ., a percentage figure arrived at by estimating the life of a building, machine, etc., and transforming this into an annual figure based upon costs . . . It should take into consideration both the

---

[6]                     TABLE B
ORIGINAL COST RATE BASE
Retail Electric Operations
May 31, 1983

| | |
|---|---:|
| Gross Plant in Service | $1,994,569,313.00 |
| Reserve for Depreciation and Amortization | (400,331,279) |
| Net Plant | $1,594,238,034 |
| Nuclear Fuel | 33,477,426 |
| Materials and Supplies | 64,143,926 |
| Net Working Capital Allowance | 33,935,373 |
| Accumulated Deferred Income Taxes | (167,779,648) |
| Customer Deposits | (6,166,446) |
| Sub-Total | $1,551,848,665.00 |
| Excess Capacity—Net Production Plant | (114,770,512) |
| TOTAL RATE BASE | $1,437,078,153.00 |

[7] This plant in service figure includes the 400 MW of excess capacity.

> physical life and the useful life of property, and should include such factors as obsolescence and supersession.

*Parker v. South Carolina Public Service Commission,* 281 S. C. 215 at 217, 314 S. E. (2d) 597 at 598 (1984). Established accounting principles require depreciation to be taken on plant that is on line and subject to wear and tear. See *Lindheimer v. Illinois Bell Telephone Company,* 292 U.S. 151, 167, 54 S. Ct. 658, 664, 78 L. Ed. (2d) 1182, 1192-93 (1934). Moreover, other jurisdictions have allowed full depreciation even though rate base was reduced to reflect an excess capacity. *Kansas Gas and Electric Company v. State Corporation Commission,* 239 Kan. 483, 720 P. (2d) 1063 (1986); *Philadelphia Electric Company v. Pennsylvania Public Utility Commission,* 61 Pa. Commw. Ct. 325, 433 A. (2d) 620 (1981). Again, there is more than ample evidence of record to support this decision of the Commission.

Finally, the Consumer Advocate challenges the Commission's finding that the carrying costs associated with the 400 MW of excess plant capacity, which is to be phased into SCE & G's system as the necessity arises, should be deferred and recovered over some future period.[8] This recovery, however, can only take place if the commission allows it in some future Order, so that this issue is not presently ripe for review. Moreover, the Consumer Advocate has conceded the issue of the carrying costs. Section 58-27-2310, South Carolina Code ann. (1976), requires a party to petition for rehearing before the Commission before proceeding to circuit court. In the petition for rehearing in this case the Consumer advocate conceded that in a phase-in rate plan, the deferral of the carrying costs is proper. The petition states, "[i]f this were a phase-in adjustment ... the carrying costs recovery would be proper." Tr. 76, 1. 9-12. The Commission in its Order stated, "[t]his [rate plan] is proposed as a means to 'phase-in' this large addition

---

[8] The Commission determined that the carrying costs on this excess capacity to be 11.74%. The overall rate of return approved by the Commission in this case is 11.74%. The propriety of this 11.74% rate of return is not challenged.

to the Company's production plant." Tr. 103. Thus, the deferral of the carrying costs is likewise supported by the transcript herein.[9]

The record in this case provides ample testimony to support the Commission's decisions regarding these very complicated matters of rate base determination, depreciation analysis and the deferral of carrying costs attributable to the excess capacity. Finding no errors by either the Commission or the Circuit Court, we affirm.

Affirmed.

HARWELL, CHANDLER and FINNEY, JJ., and JOHN P. GARDNER, Acting Associate Justice, concur.

[9] The Consumer Advocate also asserted in his brief that the circuit court erred in refusing to include his proposed findings of fact in the transcript of record pursuant to Section 1-23-320(g)(5). At oral argument, the Consumer Advocate admitted he had suffered no prejudice in that his proposed findings were included in the transcript; thus, this issue is moot.