William R. LLOYD, Jr., Small
Business Advocate,
Petitioner

v.

PENNSYLVANIA PUBLIC UTILITY
COMMISSION, Respondent.

Irwin A. Popowsky, Consumer
Advocate, Petitioner

v.

Pennsylvania Public Utility
Commission, Respondent.

Commission on Economic Opportunity,
Petitioner

v.

Pennsylvania Public Utility
Commission, Respondent.

PP&L Industrial Customer
Alliance, Petitioner

v.

Pennsylvania Pubic Utility
Commission, Respondent.

Commonwealth Court of Pennsylvania.

Argued May 10, 2006.
Decided Aug. 4, 2006.

Steven C. Gray, Harrisburg, for petitioner, William R. Lloyd, Jr.

Lawrence F. Barth, Asst. Counsel, Harrisburg, for respondent.

David B. MacGregor, Philadelphia, for intervenor, PPL Electric Utilities Corporation.

BEFORE: McGINLEY, Judge, SMITH–RIBNER, Judge, PELLEGRINI, Judge, FRIEDMAN, Judge, LEADBETTER, Judge, COHN JUBELIRER, Judge, and LEAVITT, Judge.

OPINION BY Judge PELLEGRINI.

Before this Court are petitions for review of the December 22, 2004 order of the Pennsylvania Public Utility Commission (Commission) filed by William R. Lloyd, Jr. on behalf of the Office of Small Business Advocate (OSBA); Irwin A. Popowsky on behalf of the Office of Consumer Advocate (OCA); the Commission of Economic Opportunity (CEO); and PP & L Industrial Customer Alliance (PPLICA) granting an increase in PPL Electric Utilities Corporation's (PPL) retail distribution and transmission rates, reimbursement for certain costs incurred as a result of Hurricane Isabel, and funding for certain public service programs.

The impetus for these appeals began on March 29, 2004, when PPL[1] filed Supplement No. 38 with the Commission seeking to increase retail distribution and transmission rates by $221,638,000. It filed for the increase with the knowledge that the "rate caps" imposed by the Electricity Generation Customer Choice and Competition Act (Competition Act)[2] were still in effect pursuant to Section 1308(d) of the Public Utility Code (Code), 66 Pa.C.S. § 1308(d),[3] the filing would be suspended

---

1. According to the Administrative Law Judge's (ALJ) recommended decision, what is now known as PPL Electric Utilities Corporation or PPL was originally founded in 1920 through the consolidation of eight electric companies as a direct subsidiary of Lehigh Power Securities Corporation. It continued to acquire and merge with other electric companies in the 1920s and 1930s, and in 1939, Lehigh Power Securities was dissolved. PPL then became a subsidiary of National Power Light Company. Between 1945 and 1947, PPL became independent. In 1994, PPL was incorporated as an energy and utility holding company and became known as PPL, Inc. In 2000, PPL, Inc. became PPL Electric Utilities Corporation, and the name of the holding company became PPL Corporation. On July 1, 2000, PPL Corporation and PPL Electric Utilities Corporation completed a corporate realignment to separate PPL Electric Utilities Corporation's regulated transmission and distribution operations from its deregulated generation operations. In 2001, PPL Corporation completed a strategic initiative to confirm the structural separation of PPL Electric Utilities Corporation from PPL Corporations' and PPL Electric Utilities Corporation's other affiliated companies. PPL Electric Utilities Corporation is now a "wires only" company. PPL presently serves approximately 1.3 million customers throughout a 10,000 square mile territory in 29 Pennsylvania counties. (ALJ's October 21, 2004 decision at 9–11.)

2. 66 Pa.C.S. §§ 2801–2812.

3. 66 Pa.C.S. § 1308(d) provides, in relevant part:

   **(d) General rate increases.** Whenever there is filed with the commission by any public utility described in paragraph (1)(i),

for seven months, and the desired effective date of the rates would be January 1, 2005, the day after the rate cap ended.

■ Numerous complaints were filed against PPL's proposed increased rates, including complaints from the OSBA, the OCA and PPLICA. The CEO filed a petition to intervene that was unopposed. After many hearings, the ALJ issued her recommendation which the Commission ultimately adopted. The OSBA, the OCA, PPLICA and the CEO have appealed from the Commission's order with each party raising different issues, but some parties joining other parties on various issues. Specifically, the parties have raised in their challenges whether the Commission properly:

- Imposed a rate structure for transmission and distribution rates that unreasonably discriminated against certain customer rate classes because they were subsidizing other customer rate classes' cost of service;
- Approved appropriate funding to the Sustainable Energy Fund, an energy conservation program, and the On-Track funding program, an assistance program for low income customers; and
- Approved recoupment of costs for extraordinary storm damage from Hurricane Isabel incurred by PPL before, but paid after, the rate caps had expired.

We have consolidated these appeals, but will address each party's issue(s) individually.[4]

## I.

## BACKGROUND

Before addressing the specific issues, it is necessary to understand the Competition Act and the changes it wrought on how electric public utilities would be regulated. "Historically, electric utilities in Pennsylvania provided three services to customers: the generation, transmission and distribution of electricity ... These 'bundled' services were performed by one local utility that held a monopoly over its service area. However, to encourage a competitive wholesale electric market and to provide cost savings to consumers, in December 1996, the Competition Act was enacted to establish competition in the sale of electric power." *ARIPPA v. Pennsylvania Public Utility Commission*, 792 A.2d 636, 642 (Pa.Cmwlth.2002). Electric deregulation broke up the utility's monopoly over the providing of electricity. New suppliers would be allowed to generate and sell electricity in wholesale markets and new retail marketers, generators or resellers of electricity, would be able to sell that electricity to the consumer. The other two

(ii), (vi) or (vii) of the definition of "public utility" in section 102 (relating to definitions), and such other public utility as the commission may by rule or regulation direct, any tariff stating a new rate which constitutes a general rate increase, the commission shall promptly enter into an investigation and analysis of said tariff filing and may by order setting forth its reasons therefore, upon complaint or upon its own motion, upon reasonable notice, enter upon a hearing concerning the lawfulness of such rate, and the commission may, at any time by vote of a majority of the members of the commission serving in accordance with

law, permit such tariff to become effective, except that absent such order such tariff shall be suspended for a period not to exceed seven months from the time such rate would otherwise become effective.

4. Our scope of review of the Commission's order is limited to determining whether the necessary findings are supported by substantial evidence and whether there was an error of law or a constitutional violation. *George v. Pennsylvania Public Utility Commission*, 735 A.2d 1282 (Pa.Cmwlth.1999).

functions—transmission and distribution—which are at issue here, would remain regulated.[5]

When setting the rates for the three traditional services, Section 2804(3) of the Competition Act, 66 Pa.C.S. § 2804(3), provided that rates for each service shall be set separately stating:

> The commission *shall require the unbundling* of electric utility services, tariffs and *customer bills to separate the charges for generation, transmission and distribution.* The commission may require the unbundling of other services. (Emphasis added.) [6]

*See also ARIPPA.*

By switching from a regulated market to a competitive market, "stranded costs" were created which could not be recovered by the utility at market rates. "Stranded costs" were the difference between the amount of revenue that could have been recovered in a regulated market and those recoverable under the new deregulated Competition Act. To recover stranded costs, the General Assembly created the competitive transition cost—costs to be paid by each ratepayer accessing the transmission or distribution network to the electric distribution company in whose territory the customer was located. However, in exchange for a utility being paid for its stranded costs, rate caps were imposed on the rate it could charge for electricity, but only for 54 months or until December 31, 2004, as these rates were being used to project expected costs (i.e., the "future test year.") [7]

The move to a competitive market also had the potential impact on certain public purpose programs, including low-income assistance and energy conservation programs, which were funded based on the utility having a monopoly and rates being bundled. In the Competition Act, the General Assembly specifically authorized continued funding of those programs by "non-bypassable" rates. 66 Pa.C.S. § 2802.

Now we will turn to the specific appeals.

## II.

### PPLICA's and OSBA's APPEALS

### Distribution and Transmission Rates

Not having had a rate increase in many years because rates were frozen by the

---

5. "Transmission and distribution costs" are defined by the Competition Act as "[a]ll costs directly or indirectly incurred to provide transmission and distribution services to retail electric customers. This includes the return of and return on facilities and other capital investments necessary to provide transmission and distribution services and associated operating expenses, including applicable taxes." 66 Pa.C.S. § 2803.

6. "Rate" is defined in the Code as "[e]very individual, or joint fare, toll, charge, rental, or other compensation whatsoever of any public utility, or contract carrier by motor vehicle, made, demanded, or received for any service within this part, offered, rendered, or furnished by such public utility, or contract carrier by motor vehicle, whether in currency, legal tender, or evidence thereof, in kind, in services or in any other medium or manner whatsoever, and whether received directly or indirectly, and any rules, regulations, practices, classifications or contracts affecting any such compensation, charge, fare, toll, or rental." 66 Pa.C.S. § 102.

7. Section 2804(4)(i) of the Competition Act, 66 Pa.C.S. § 2804(4)(i), provides, in relevant part:

> (4) The following caps on electric utility rates shall apply:
> (i) For a period of 54 months from the effective date of this chapter or until an electric distribution utility is no longer recovering its transition or stranded costs through a competitive transition charge or intangible transition charge and all the customers of an electric distribution utility can choose an alternative provider of electric generation, whichever is shorter.

"caps," PPL filed its request in 2004 to increase its distribution and transmission rates so that they would take effect on January 1, 2005, after the test year was completed and the rate cap expired.[8] The request had an announced goal of limiting the rate increase for all classes of customers to below 10% of the **total** bill. Because the generation component was still under the rate caps imposed by the Competition Act and would not be going up at all, using the total bill as a measure masked the true overall percentage increase sought in distribution and transmission revenues which was 32.8%.[9] The other announced objective was to move each customer class closer to the system average rate of return for distribution service.

When setting rates, Section 1301 of the Public Utility Code, 66 Pa.C.S. § 1301, provides that "[e]very rate made, demanded, or received by any public utility, or by any two or more public utilities jointly, shall be just and reasonable, and in conformity with regulations or orders of the commission." The rate made is determined by two factors—what increase in revenues over those produced by existing rates is needed to give the utility a fair rate of return and what increased revenues are going to be allocated in the rates among the various rate classes, i.e., the rate structure.[10]

Regarding how revenues are raised and allocated between rate classes, Section 1304 of the Public Utility Code, 66 Pa.C.S. § 1304, now provides:

> No public utility shall establish or maintain any unreasonable difference as to rates, either as between localities or as between classes of service.

In *Philadelphia Suburban Transportation Company v. Pennsylvania Public Utility Commission*, 3 Pa.Cmwlth. 184, 281 A.2d 179, 186 (1971), we quoted with approval the following language from a Commission opinion in another case as properly descriptive of the principles applicable to the fixing of reasonable rate schedules:

8. Electric power is delivered to a home or business through the transmission and distribution system. The electric power transmission system transfers bulk electrical power from place to place, usually over long distances, through overhead power lines. Due to the large amount of power involved, transmission is between the electric generator at very high voltages to a regional substation where the voltage is stepped down for further transmission to distribution substations for conversion to distribution voltages. The power is then sent to the distribution system and eventually, after further stepdown in voltage, to customers. PPL obtains transmission services from the Pennsylvania–New Jersey–Maryland Interconnect (PJM), a pool comprised of 11 electric utilities serving portions of Pennsylvania, New Jersey, Maryland, Delaware, the District of Columbia and Virginia, to move electricity from generating stations to its distribution system. The cost of delivering the power through the electric grid to the distribution system is the transmission service

charge. The cost of the delivery distribution system to the customer is the distribution charge.

9. The total distribution rates paid before the rate increase by the residential or RS customer class was $293,920,000, and after the rate increase, it was to be $774,883,000. For the commercial GS–1 customer class, the rate increase went from $61,460,000 to $83,478,000.

10. Rate classes are established by taking similarly situated customers with similar characteristics as to the type of service (e.g. residential, commercial and industrial) and the type and demand of service (e.g. amount of usage and demand load) and rates that are designed to recover the cost of serving that class. When a utility files for a rate increase, it must file a cost-of-service study assigning to each customer class a rate based upon operating costs that it incurred in providing that service. 52 Pa.Code § 53.53. Exhibit C. IV. E.

There is no requirement that rates for different classes of service must be either uniform or equal or that they must be equally profitable. Differences in rates between classes of customers based on such criteria as the quantity of electricity used, the nature of the use, the time of the use, the pattern of the use, or based on differences of conditions of service, or cost of service are not only permissible but often are desirable and even necessary to achieve reasonable efficiency and economy of operation. Rate structure, which is an essential, integral component of rate-making, is not merely a mathematical exercise applying theoretical principles. Rate structure must be based on the hard economic facts of life and a complete and thorough knowledge and understanding of all the facts and circumstances which affect rates and services; and the rates must be designed to furnish the most efficient and satisfactory service at the lowest reasonable price for the greatest number of customers, i.e., the public generally. While cost to serve is important, other relevant factors may also be considered.

In a later case, *Philadelphia Suburban Water Company v. Pennsylvania Public Utility Commission*, 808 A.2d 1044, 1060 (Pa.Cmwlth.2002), where a rate was being challenged as unreasonable, we stated:

> [I]n order for a rate differential to survive a challenge brought under Section 1304 of the Public Utility Code, 66 Pa. C.S. § 1304, the utility must show that the differential can be justified by the difference in costs required to deliver service to each class. The rate cannot be illegally high for one class and illegally low for another. *Allegheny Ludlum Corp., 612 A.2d at 611.* Overall, the rate differentials must advance efficient and satisfactory service to the greatest number at the lowest overall charge.

Not involved in this case is the overall increase in revenues to which PPL is entitled, but at issue is whether differential in rates between rate classes for distribution and transmission charges can be justified as reasonable.

### A.

In its filing, PPL used different methods for calculating and allocating increased revenue needs among the rate classes for distribution and transmission rates in setting its rate structure. For distribution rates, PPL submitted a new distribution cost of service study establishing a new rate structure for the various classes of service. Regarding the commercial GS–1 customer class or small businesses, the customer class the OSBA represents, PPL's cost of service study indicated that the commercial GS–1 customer class was overpaying its distribution cost of service prior to the proposed rate increase as it showed a rate of return of 9.28%, where as the RS class or residential service class showed only a 1.60% with a system average return of 3.9%. This meant that that the RS rates were under-recovering costs and GS–1 rates were over-recovering costs by a substantial amount. More simply put, under the old rates, commercial customers were subsidizing residential customers' cost of service.

In its rate filing, PPL proposed assigning distribution rate increases to *every* customer class, including the GS–1 class, so that it could recover the overall **$164.4 million** distribution increase requested. It proposed to increase its distribution charges by an average of 32.8% and proposed an increase to the distribution charges paid by the GS–1 class of 35.8% or 9.94% on a total bill basis. That meant PPL was proposing a revenue allocation of approximately $80,930,691 that RS custom-

ers would pay and $21,958,604 that GS–1 customers would pay. Under the PPL proposal, the GS–1 proposed rate increase provided a rate of return at 16.17% as compared to a rate return of 5.29% for the RS customers, with an overall rate of return of 8.8%.[11]

In its filing for rate relief for transmission charges, PPL sought an increase in the customer's transmission service charge to "pass through" to customers for transmission services it purchased from PJM in the amount of $57.2 million. Unlike for distribution charges, PPL did not perform a cost of service study, but instead proposed that the transmission service charge would be passed through to customers on a uniform basis at $0.0564 per kWh and would aid its goal of limiting the overall increase for each customer class to less than 10% calculated on a "total bill basis." [12]

PPLICA opposed funding the rate of the transmission charge increase by an across-the-board flat percentage increase contending that it would violate the Competition Act's requirement that the cost of electric service be unbundled and that "transmission rates should be viewed as stand-alone rates, and should be set in isolation from distribution rates." (ALJ's October 21, 2004 decision at 134.) To set rates in that manner, it argued, resulted in large customers bearing a disproportionate amount of the transmission, making already discriminatory rates even more discriminatory.[13] It also argued that trans-

11. The OCA agreed with PPL's assignment of revenues and agreed that principles of gradualism, avoidance of "rate shock" and fundamental fairness required a "measured approach" to bringing rates in line with costs. The OCA, however, disagreed with PPL's cost of service study and provided its own calculations as to what it believed was a fair measure of bringing the rates in line with the costs. The OSBA also submitted a cost-of-service study proposing $117.1 million that RS customers would pay of PPL's proposed $162.3 million distribution rate increase compared to the $80.9 million proposed by PPL and $9.1 million that GS–1 customers would pay compared to the $21.9 million proposed by PPL.

12. The OCA supported this proposal arguing that a uniform rate was a reasonable way to collect transmission revenues during this period of transition, further stating: "[T]he OCA strongly supports this objective to keep all rate schedules' revenue increases under 10%—an approach which effectively eliminates rate shock, incorporates the principle of gradualism, and recognizes the transitional period in which PPL continues to operate." (ALJ's October 21, 2004 decision at 133.)

13. The chart below shows that the total interclass subsidization was substantial:

| Rate Schedule | 2004 Annual Transmission Revenue | Revenue Increase under Commission Order | Transmission Subsidy Under Commission |
| --- | --- | --- | --- |
| RS, RTS, BL | 49,576,000 | 25,288,000 | 19,887,350 |
| GS-1 | 11,800,000 | (478,000) | (484,317) |
| GS-3 | 38,389,000 | 7,895,000 | (6,819,950) |
| LP-4 | | | |
| LP-5 | 1,497,000 | 820,000 | (3,399,889) |
| LP-6 | 1,574,000 | 1,313,000 | (928,570) |
| LPEP | 39,000 | 367,000 | (61,539) |
| GH | 1,497,000 | 313,000 | 1,013,243 |
| SL/AL | | | 36,279 |

mission rates had to be set and calculated the same way as the distribution rates, i.e., based on a cost-of-service study for each customer class.

While both the ALJ and the Commission noted that there were substantial differentials in the rate structure between rate classes for both distribution and transmission service, they believed that those differentials were not unreasonable and were justified based on the principle of gradualism and mitigation of rate shock.[14] Dismissing the OSBA's exceptions to the ALJ's recommendation that PPL's proposed revenue allocation be adopted, the Commission agreed with PPL and the OCA that "a 10% ceiling on rate schedule increases on a total bill basis is appropriate methodology in this case to address the need to move rate schedules closer to the system average rate of return while recognizing the principles of gradualism and mitigation of rate shock." (Commission's

December 22, 2004 decision at 81.) It further determined that PPL's proposed allocation was appropriate at the current time and led to a "just and reasonable" result, *albeit* it was not moving in the direction as quickly as the OSBA wanted it to move.

Regarding transmission charges, the ALJ adopted PPL's approach and recommended that the across-the-board rate increase of $0.0564 per kWh be approved for all classes of customers. Dismissing PPLICA's exceptions, the Commission adopted the ALJ's recommendation stating that "[i]n doing so, we note that PPLICA was persuasive in its arguments. However, we agree with the OCA that PPL is now in a transition to full competition. Accordingly, principles of gradualism,[15] mitigation of rate shock and rate stability are extremely important. As PPL moves further along in its transition, it is possible

| IS-1 | 10,000 | 2,000 | (1,969) |
|------|--------|-------|---------|
| IS-P | 1,497,000 | 820,000 | (482,881) |
| IS-T | 7,066,000 | 4,061,000 | (3,671,265) |

14. "Gradualism" is a principle of rate design that rates will be gradually increased to avoid "rate shock"—in this case caused by transition from capped rates to rates set more closely to the traditional ratemaking process by "gradually" reducing rate of return differentials between the classes. Large rate increases have the potential to cause "rate shock" among customers. Technically, rate shock applies when a rate increase is associated with a significant drop in usage, reflecting the unwillingness or inability of customers to pay for those services. Due to the inelastic demand for essential services, such as utilities, any decrease in usage is minor and transitory. There is a non-technical definition of "rate shock" which is used to describe the public outcry associated with rate increases. To mitigate both forms of rate shock, the remedy is "gradualism," i.e., phasing in rates or closing rate differentials over a longer period of time allowing consumers to gradually make the adjustments in the "elastic" part of their spending so as to pay for increased utility costs, not to mention lessening the

pressure on the Commission and the utilities to dampen rate increases.

15. The need for "gradualism" was explained by PPL's expert, Oliver Kasper, and relied on by the Commission to justify its approach. He testified that:

This is [PPL's] first rate increase filing in almost ten years. Under normal circumstances, i.e., no rate caps, [PPL's] rates probably would have changed in small increments on several occasions over the past ten years. [PPL's] transmission and distribution rates have been subject to the rate cap, so these more modest filings could not be made. As a result, a larger percentage increase is now required. Because of this, [PPL] determined to limit the total amount of the increase to any rate class to 10%. This limitation also is consistent with the principle of gradualism in rate design.

(Reproduced Record at 89a.)

that those principles will be more closely balanced and cost causation will move to the fore." (Commission's December 22, 2004 decision at 78.) (Emphasis added.)

**B.**

While the OSBA only has appealed the distribution rate structure and PPLICA has appealed both the distribution and transmission rate structures, both contend that distribution and transmission rate structures are "unreasonable" and in violation of Section 1304 of the Public Utility Code, 66 Pa.C.S. § 1304, because the rates discriminated against commercial and/or industrial customers by further increasing the subsidies that they were providing to residential customers. PPLICA further contends that by applying the principles of gradualism and rate shock on a total bill basis, the Commission violated the Competition Act. It explains that prior to the Competition Act, the Commission reviewed any rate relief on the "total bill" basis which included expenses for generation, transmission and distribution. It was against that total bill that rate structure was set. It argues that the passage of the Competition Act required rates to be unbundled and requires the Commission to separately set rates and provide a rate structure on a stand-alone basis for each of those services. If the Commission wants to justify differences in rates utilizing the principles of gradualism and rate shock, PPLICA argues that the Commission must do so in the context of setting the separate and distinct rates for distribution and transmission services. Moreover, both the OSBA and PPLICA contend that rather than closing the gap in cross class subsidization as the principle of gradualism would suggest, the Commission's order exacerbates the discrimination by increasing the subsidization.

■ Not disputing that commercial and industrial customer classes are paying more in distribution and/or transmission rates than they should, the Commission, the OCA and PPL argue that the rate set here was not unreasonable nor discriminatory because there is no set formula for determining the proper ratios among the different customer classes for cost of service, and differences in rates can be justified if there is some basis for the discrepancy.[16] *Peoples Natural Gas Company v. Pennsylvania Public Utility Commission,* 47 Pa.Cmwlth. 512, 409 A.2d 446 (Pa. Cmwlth.1979). Because the Commission

---

**16.** While most public utility codes, including Pennsylvania's, do not specifically authorize the Commission to use the principle of "gradualism" in setting rates, as part of what is overall considered a reasonable rate under the circumstances, "gradualism" is permitted in implementing large rate increases as long as it does not violate the principle of retroactive ratemaking. *Sharon Steel Corporation v. Pennsylvania Public Utility Commission,* 78 Pa.Cmwlth. 447, 468 A.2d 860 (1983) ("Sharon has not been able to cite any legal basis for treating the risk and gradualism criteria as impermissible bases for justifying customer classification and the consequent rate differences."); *Barasch v. Pennsylvania Public Utility Commission,* 101 Pa.Cmwlth. 76, 515 A.2d 651 (1986.); *see also Office of Consumer Counsel v. Department of Public Utility Control,* 252 Conn. 115, 742 A.2d 1257 (2000); *Citizens Action Coalition of Indiana v. Northern Indiana Public Service Company,* 582 N.E.2d 387 (Ind.App.1991); *Mississippi Public Service Commission v. Dixie Land and Water Company,* 707 So.2d 1086 (1998); *In Re PNM Gas Services,* 129 N.M. 1, 1 P.3d 383 (2000); *State of North Carolina v. Carolina Utility Customers,* 351 N.C. 223, 524 S.E.2d 10 (2000); *Hamm v. South Carolina Public Service Commission,* 294 S.C. 320, 364 S.E.2d 455 (1988); *In the Matter of the Establishment of Switched Access Rates for U.S. West Communications, Inc. v. AT&T,* 2000 SD 140, 618 N.W.2d 847 (2000). *But see State ex rel. Utilities Commission v. Public Staff, North Carolina Utilities Commission,* 331 N.C. 215, 415 S.E.2d 354 (1992).

has discretion in the transition period to set rates so that "gradually" classes of customers' rates move closer to the system average rate of return, it argues the fact that it has not yet eliminated all cross-class subsidies is not sufficient to establish that the resulting rates are unduly discriminatory.[17]

In this case, there is no dispute that there is a substantial difference in costs required to deliver services between classes. For such a rate differential to survive a discriminatory rate challenge brought under Section 1304 of the Code, 66 Pa.C.S. § 1304, it must be shown that the differential can be justified. In this case, the Commission offers essentially one justification—gradualism and rate shock.

The Commission defines gradualism as limiting the increase to 10% of the total bill—period. It does not explain why 10% of the total bill is the magic number that will prevent rate shock; it is just a number before which all other considerations must fall. It also never explains how the acknowledged discriminatory rate class structures are going to be lessened, only that gradualism is served by limiting the total bill increase by less than 10%. However, while permitted, gradualism is but one of many factors to be considered and weighed by the Commission in determining rate designs, and principles of gradualism cannot be allowed to trump all other valid ratemaking concerns and do not justify allowing one class of customers to subsidize the cost of service for another class of customers over an extended period of time. *Watergate East, Inc. v. Public Service Commission of District of Columbia*, 665 A.2d 943 (D.C.App.1995). Because the flat percentage increase in transmission charges increases any previous discrimination in rates, and the Commission offers no explanation how discrimination in distribution and transmission rate structures are eventually going to be gradually alleviated, in effect, the Commission has determined that the principle of gradualism trumps all other ratemaking concerns—especially the polestar—cost of providing service.

Not only did the Commission allow gradualism to trump all other factors without providing a sufficient explanation, the total bill method is not in accord with the Competition Act. Section 2804(3) of the Competition Act mandates rates for services as unbundled charges for transmission, distribution and generation and requires that rates and rate structures be set for each service primarily on a cost-of-service study. By working backwards to achieve its goal of limiting the rate increase to 10% of the total bill, the Commission, in effect, "rebundles" distribution, transmission and generation rates in determining the allocation of the transmission and distribution rate increases among customer classes just so it can meet the goal of having a total bill that is less than a

---

17. The Commission relied on one of PPL's witnesses (Kleha) who explained:

PPL Electric's current rate structure is a product of the rate unbundling process which occurred in its electric restructuring proceeding. The unbundling of rates in that proceeding was based on the cost allocation study from PPL Electric's 1995 base rate proceeding which reflects the Company's operation as a vertically integrated electric company. Thus, PPL Electric's current rate structure contains vestiges of its prior vertical integration. The rate cap on PPL Electric's transmission and distribution rates ends on December 31, 2004, but the cap on generation rates extends through 2009. It would be inappropriate, in my view, to undertake a major revision to PPL Electric's cost allocation procedures in these circumstances. Any such review should await the expiration of the cap on generation rates.

(Reproduced Record at 379a–380a.)

10% increase. While "gradualism" can be used to justify differences between rate classes for each unbundled rate, the "total bill" impact standard is inconsistent with the changes implemented by the Competition Act. To allow the principle of gradualism to be applied on a total bill basis when each service is a stand-alone rate structure would be like saying that the Commission could apply the principle of gradualism in an electric case based on a customer's total utility bill, i.e., the amount a rate payer would pay for electric, gas, water and tele-communications services.

Accordingly, we vacate the Commission's order regarding transmission and distribution rates and remand for the setting of non-discriminatory reasonable rates and rate structure for each service.

### III.

### OCA's & PPLICA's APPEALS

#### Rate Caps

On October 20, 2003, PPL filed with the Commission a Petition of PPL Electric Utilities Corporation for Authority to Defer for Accounting and Financial Reporting Purposes Certain Losses from Extraordinary Storm Damage and to Amortize Such Losses that it incurred caused by Hurricane Isabel for accounting and financial reporting purposes. During

that proceeding, PPL indicated that it was not seeking authority to recover losses from its customers, but it intended to seek recovery of those losses in the rate proceeding.[18] By order dated January 16, 2004, the Commission granted the petition but without any assurance that the deferred amounts could be included or amortized in rates.

Even though reimbursement for the costs sustained from Hurricane Isabel were *during* the rate cap period and not within any exception to the rate cap, when PPL filed its rate increase in distribution and transmission charges, it sought to recover $15 million through amortization over five years without earning any return on the uncollected amounts[19] *after* January 1, 2005, when the rate cap period was no longer in effect. PPL's position was that 66 Pa.C.S. § 2804 (relating to standards for restructuring of electric industry and caps on rates) only discussed changes in rates and did not discuss collection of costs.

The OCA and PPLICA argued that any expenses incurred during the rate cap period had to be paid out of the revenues collected from rates in effect *during* that period because a utility could not defer costs for collection until after the end of the rate cap. If it did, that would consti-

**18.** Section 2804(4)(i) of the Act provides, in relevant part:

> The following interdependent standards shall govern the commission's assessment and approval of each public utility's restructuring plan, oversight of the transition process and regulation of the restructured electric utility industry:
>
> * * *
>
> (4) The following caps on electric utility rates shall apply:
> (i) For a period of 54 months from the effective date of this chapter or until an electric distribution utility is no longer recovering its transition or stranded costs

through a competitive transition charge or intangible transition charge and all the customers of an electric distribution utility can choose an alternative provider of electric generation, whichever is shorter.

**19.** PPL alleged that the $15 million in expenses included $3,631,282 for wages and benefits (regular time); $3,529,212 for wages and benefits (overtime); $279,744 for employee meals and miscellaneous; $423,846 for vehicles and equipment; $371,159 for materials and supplies; $21,781 for customer outreach; $163,983 for miscellaneous; and $6,590,942 for outside crews, for a total of $15,011,949.

tute a *de facto* rate cap exception or a violation of the Competition Act. They also contended that the regular wages and benefits should be excluded from the claim because a large portion of expenses were for regular and overtime salaries and wages.

Because the Commission had a long-standing practice of allowing a utility to collect compensation for extraordinary or abnormally large historic costs through amortization, the ALJ agreed with PPL that prospective recovery of deferred Hurricane Isabel expenses would not violate the rate cap and was consistent with prior Commission practice. However, the ALJ excluded from recovery regular wages and benefits stretched to 10 years over the recovery period because storms like Hurricane Isabel were rare occurrences as PPL

had not experienced such a storm for 80 years.

The OCA and PPLICA filed exceptions to the ALJ's determination again arguing that the allowance of future recovery of Hurricane Isabel costs would constitute a *de facto* rate cap exception and violate Section 2804(4) of the Competition Act. Agreeing with the ALJ's findings, the Commission denied the exceptions of the OCA and PPLICA and adopted the ALJ's recommendations.

On appeal, the OCA and PPLICA argue that the Commission erred by allowing a retroactive payment for costs incurred by Hurricane Isabel because under Section 2804(4)(iii) of the Competition Act, 66 Pa. C.S. § 2804(4)(iii), there are limited exceptions to the rate caps [20] and there is no

---

**20.** 66 Pa.C.S. § 2804(4)(iii) lists those exceptions as follows:

(iii) An electric distribution utility may seek, and the commission may approve, an exception to the limitations set forth in subparagraphs (i) and (ii) only in any of the following circumstances:

(A) The electric distribution utility meets the requirements for extraordinary rate relief under section 1308(e) (relating to voluntary changes in rates).

(B) Either the electric distribution utility is required to begin payment under contracts with nonutility generation projects that have received commission orders, has been unable to mitigate such costs, such costs are not recoverable in a competitive generation market and such costs were not previously covered in the competitive transition charge or intangible transition charge, or the utility prudently incurs costs related to cancellation, buyout, buy down or renegotiation of nonutility generating project obligations of the utility consistent with section 527 (relating to cogeneration rule and regulations) and such costs were not previously covered in the competitive transition charge or intangible transition charge. Costs related to cancellation, buyout, buydown or renegotiation shall be recovered from ratepayers over a period not to exceed three years, unless the commission determines within its discretion to require a longer

recovery period due to the magnitude of such costs, but shall be accounted for by the utility on a levelized basis over the total period in which the generation portion of the utility's rates are capped.

(C) The electric distribution utility is subject to significant increases in the rates of Federal or State taxes or other significant change in law or regulations that would not allow the utility to earn a fair rate of return.

(D) The electric distribution utility is subject to significant increases in the unit rate of fuel for utility generation or the price of purchased power that are outside of the control of the utility and that would not allow the utility to earn a fair rate of return.

(E) The electric distribution utility is directed by the commission or an independent system operator or its functional equivalent to make expenditures to repair or upgrade its transmission or distribution system.

(F) The electric distribution utility seeks to increase its allowance for nuclear decommissioning costs to reflect new information not available at the time the utility's existing rates were determined, and such costs are not recoverable in the competitive generation market and are not covered in the competitive transition charge or intangible transition charge, and such costs would not allow the utility to earn a fair rate of return.

(G) As permitted by paragraph (16).

exception for storm damages, even for an extraordinary storm. The Commission and PPL counter by arguing that the rate cap provisions did not invalidate traditional ratemaking, which allowed extraordinary, non-recurring expenses to be deferred and amortized following the first rate case after the expenses occurred.[21] For the purpose of recovering extraordinary expenses, they argue that it should not matter that the expenses were incurred during the rate cap period because recovery would occur after the rate cap period ended.

■ The issue in this case then is whether the Commission may reimburse storm expenses incurred when the rate caps were in effect as extraordinary costs in a subsequent rate filing pursuant to Section 1308(e) of the Code after the rate caps have expired. In *ARIPPA*, we dealt with a similar issue. That case dealt with two electric distribution companies which sought increases in rates under an exception to the rate caps on the grounds that they had experienced substantial increases in costs of power purchased to provide "provider of last resort" services which were beyond their control. In the alternative, they also requested authority to track their purchased power costs, defer them and recover those costs as stranded costs through their competitive transition charges. We held that the electric companies did not qualify for the exceptions to

the rate caps under the Competition Act because increases in the purchased power costs were not beyond their control, i.e., an act of God, but instead were a business decision that had gone bad.

While *ARIPPA* was different because it involved whether a utility was entitled to breach the rate caps under one of the exceptions, it stands for the basic proposition that the "deal" the utilities made for receiving the billions of dollars in stranded costs was that rates were frozen for 54 months and that the utility was going to bear the risk of any increased costs in providing service unless the increased costs fell within one of the Competition Act's exceptions that allowed the utility to seek relief. The net effect of the Commission order is to breach that regulatory bargain by impermissibly allowing PPL to recover expenses incurred during the rate cap period that it agreed to bear by receiving stranded costs. Although the Commission states that it has a longstanding practice of allowing extraordinary or abnormal historic costs, during the period that the rates caps were in effect, the Commission's general authority under Section 1308(e) of the Code was taken away, and the only extraordinary costs that the Commission could award were those extraordinary costs set forth in the exceptions to the rate caps in Section 2804(4)(iii) of the Competition Act.

---

21. Section 1308(e) of the Code, 66 Pa.C.S. § 1308(e), provides, in relevant part:

(e) **Extraordinary rate relief.**-Upon petition to the commission at the time of filing a rate request or at any time during the pendency of proceedings on such rate request, any public utility may seek extraordinary rate relief of such portion of the total rate relief requested as can be shown to be immediately necessary for the maintenance of financial stability in order to enable the utility to continue providing normal services to its customers, avoid reductions in its normal maintenance programs, avoid

substantially reducing its employment, and which will provide no more than the rate of return on the utility's common equity established by the commission in consideration of the utility's preceding rate filing, except that no utility shall file, either with a request for a general rate increase or at any time during the pendency of such a request, more than one petition under this subsection pertaining to rates for a particular type of service, nor any supplement or amendment thereto, except when permitted to do so by order of the commission.

Accordingly, because the Competition Act does not provide for reimbursement during the rate period for storm expenses, the order of the Commission is reversed on this issue.

## IV.

The last two appeals deal with continued funding of public purpose programs—one dealing with energy conservation and the other with low income customers. In one appeal, the party contends that the usage of money directed toward the fund is unrelated to distribution service and should not be funded by ratepayers, while in the other appeal, the party argues that not enough money is being spent towards low income customers to increase enrollment.

## A.

## PPLICA's APPEAL

### Sustainable Energy Fund (SEF)

■ The SEF is a fund/Pennsylvania non-profit corporation formed under the terms of the Joint Petition for Full Settlement of PPL's restructuring plan.[22] The purpose of the fund is to promote the development and use of renewable energy and clean energy technologies, energy conservation and efficiency which promote clean energy. Pursuant to the Joint Petition for Full Settlement of PPL's Restructuring Plan which created the SEF, the SEF was funded via transmission and distribution rates on power sold to all customers, and all parties to the settlement were in agreement with that arrangement at the time of the settlement.[23] PPL proposed to continue SEF's funding as part of its distribution rates at its current level of 0.01 cents per kWh for all customers for a period to end no later than December 31, 2009.[24] PPL proposed to include $3,689,000 in continued SEF funding and to have it included as an allowable cost of distribution service expense. However, PPL pointed out that the parties to the settlement were no longer in consensus regarding the funding of SEF. PPL argued that SEF funding should continue to aid in reducing demand from existing projects and from future projects in the remaining years of PPL's transition period.

PPLICA opposed continued funding for SEF contending that cost was unrelated to distribution service and should not be funded by distribution ratepayers. It also

**22.** Section E.5 of the Joint Petition for Full Settlement of PPL's Restructuring Plan provides:

Sustainable Energy Fund. [PPL] will establish a sustainable energy fund which shall be funded from the 1.74 cents per KWH transmission and distribution rate at .01 cents per KWH (less applicable gross receipts tax) on all power sold for all customers beginning on January 1, 1999 and ending on December 31, 2004, or until the Commission establishes new distribution rates, whichever is longer. The .01 cents per KWH shall not automatically be considered a cost of service element upon expiration of the transmission and distribution rate cap on December 31, 2004. The Sustainable Energy Fund shall be managed by an administrator designated by a seen-member Board of Directors to be nominat-

ed by the Joint Petitioners and approved by the Commission. The fund shall operate according to the procedures set forth in its by-laws, which are to be reviewed and approved by the Commission. The fund is to have an annual audit and is to make semi-annual reports to the Commission and to the parties. The purpose of the fund is to promote the development and use of renewable energy and clean energy technologies, energy and conservation and efficiency which promote clean energy.

**23.** In other words, SEF received its funding through the application of the SEF Rider in PPL's Tariff No. 201 which expired on December 31, 2004.

**24.** PPL included $3.689 million as a distribution expense in the future test year.

argued that including SEF funding as an expense in PPL's rate was illegal and unreasonable because none of SEF"s projects had produced any benefits for PPL ratepayers. It was also argued that the funding was actually a hidden tax.[25]

The ALJ first pointed out that the settlement stated that the 0.01 cent per kWh was not automatically considered a cost-of-service element upon expiration of the caps. The ALJ disagreed that the funding was a hidden tax because not only was it out in the open and above board, but SEF"s activities were the kind that the Commission had encouraged utilities to perform and were designed to fit in with and accentuate utility functions as well as conferring benefits on PPL's ratepayers. The ALJ then recommended that the Commission approve funding SEF as part of PPL's rates, but also that it give consideration to setting declining amounts so that by the end of five years or December 31, 2009, funding would be completed.

Dismissing PPLICA's exceptions, the Commission found that the examples of projects contained in the ALJ's recommended decision as well as those explained in SEF"s exceptions supported that there was a direct benefit to ratepayers and that SEF had helped to foster the development of alternate sources of energy. Additionally, SEF had managed its funding and had a strong balance sheet showing net assets of $12,203,454 as of June 30, 2003. Nonetheless, the Commission stated that it was now an appropriate time to begin eliminating the use of distribution revenues to support SEF, and while it agreed with the ALJ's rationale for approving continued funding to SEF, it also approved

ratepayer funding for SEF only through December 2006. It stated that the funding level to be included within the distribution rates for 2005 and 2006 was 0.01 and 0.005 cents per kWh, respectively.

On appeal, PPLICA contends that the Commission's approval of PPL's SEF funding proposal should be reversed because there is no demonstrable benefits to ratepayers or a legal justification for the program. Because there are "demonstrable benefits," PPLICA then goes on to argue that there is no legal justification for funding the SEF in distribution rates because it is really just a way to get ratepayers to fund private ventures that SEF subsidizes. Such funding, it argues, constitutes an unlawful tax on ratepayers which only the General Assembly has the power to impose pursuant to Article 2, Section 1 of the Pennsylvania Constitution, not the Commission. PPLICA's argument fails for several reasons.

What the core of that argument ignores is that the General Assembly has specifically authorized that public service programs such as SEF be funded. Recognizing that certain programs funded under the utility monopoly and bundled rate regime were at risk once the electric industry was deregulated, it provided in the Competition Act that such funding be continued and that it be funded as an allowable expense by a "non-bypassable rate mechanism." Section 2802(17) of the Competition Act provides:

> There are certain public purpose costs, including programs for low-income assistance, energy conservation and others,

---

**25.** The OSBA did not take a position on whether SEF should be funded by ratepayers beginning on January 1, 2005, but argued that any new funding should be paid by the Pennsylvania Energy Development Authority (PEDA). The OSBA argued that SEF was not spending the money that it already had, it made questionable investments in the stock market, it had high administrative expenses, and the projects it selected were unfocused internally.

which have been implemented and supported by public utilities' bundled rates.[26] The public purpose is to be promoted by continuing universal service and energy conservation policies, protections and services, and full recovery of such costs is to be permitted through a non-bypassable rate mechanism.[27]

Even if authorized, PPLICA argues SEF should not be funded because it does not meet the "demonstrable benefits" standard [28] for the inclusion of social programming costs in utility rates.[29] Specifically, it argues that SEF's distributed generation projects produced no demonstrable benefits to PPL distribution ratepayers, its wind farm projects produced no demonstrable benefits to PPL distribution ratepayers, and advances to public policy goals of encouraging renewable energy were not demonstrable benefits for distribution ratepayers. It goes on to argue that any theoretical benefits to customers were not quantified and did not outweigh the $3 million per year in funding that SEF received during 2005 and would continue to receive if the Commission was affirmed on this issue.

However, based on substantial evidence presented by SEF, the Commission found that there were benefits to the PPL distribution system from the SEF projects that provided demonstrable benefits to ratepayers, including the following programs:

● PowerWeb.omni link software—a demand side management tool that helps industrial customers manage their load during peak periods;

● The Twin Valley School District's Green Leadership Energy and Environmental Design silver school which will save 172,200 kWhs per year of base load;

● The advanced energy control system for the Allentown Technology Center which develops businesses in the city and saves 1,325,050 kWhs per year of energy; and

● Grant support for the Green Building Association of Central Pennsylvania design to "build the capacity of professional and building owners to upgrade beyond current building code to the advance energy standards of the U.S. Building Association Leaderships in Energy and Environment Design-

**26.** Section 2804(9) of the Competition Act, 66 Pa.C.S. § 2804(9), defines "universal service and energy conservation" as:

Policies, protections and services that help low income customers to maintain electric service. The term includes customer assistance programs, termination of service protection and policies and services that help low income customers to reduce or manage energy consumption in a cost effective manner, such as low income usage reduction programs, application of renewable resources and customer education.

**27.** It also argues that the Commission failed to consider the specific guidelines contained in Act 213 or the Alternative Energy Portfolio Standards Act as to how SEF would be funded as utilities' distribution rate caps expired over the next several years. Act 213 was

signed into law on November 30, 2004, which did not exist at the time the record closed.

**28.** *See Pennsylvania Public Utility Commission v. PP & L Corp.,* Docket Nos. R–00943271C001–C0145SEF, Order entered September 27, 1995, 85 Pa.P.U.C. 306, 339–40, 1995 WL 803507 (1995).

**29.** PPLICA also argues that at the time of the PPL Restructuring Settlement, the parties only agreed to establish a funding mechanism for SEF through December 31, 2004. That settlement specified that the funding for SEF would not automatically be considered a proper expense to include in PPL's distribution rates in any rate case filed after December 31, 2004. It did not state that SEF funding would not be considered at all. Ergo, that meant SEF funding could be considered.

er." Typically this gains 30 to 40% improvement in energy use.

Although PPLICA pointed out projects which were not successful with SEF funding, the Commission stated that there were also many projects that were successful. Because it was within its authority as factfinder to find that there were benefits to these projects and ratemaking questions require the exercise of the Commission's expertise, it was well within the Commission's discretion to determine that SEF projects produced demonstrable benefits for ratepayers. *Popowsky v. Pennsylvania Public Utility Commission,* 869 A.2d 1144 (Pa.Cmwlth.2005). We will not disturb that determination.

PPLICA also contends that any benefits from the SEF program relate to generation service and not to distribution service, and forces customers to subsidize particular generation suppliers and technologies through distribution rates which is "antithetical" to the notion of generation supply choice, thereby frustrating the legislative intent underlying the Competition Act. Again, it cannot be antithetical to the Competition Act because the Competition Act specifically intends that conservation programs continue to be funded and only provides that it be funded by "non-bypassable rates" without any requirement that it be by a rate that is directly benefited by the program. In any event, the projects funded by SEF related to distribution service, and SEF offered expert testimony on how

the projects funded by SEF were directly related to the distribution system and why SEF funding belonged in the distribution system tariff.[30] The Commission apparently found that testimony credible, and we will not substitute our judgment for that of the Commission when substantial evidence supports its decision on a matter within the Commission's expertise. *UGI Utilities v. Pennsylvania Public Utility Commission,* 863 A.2d 144 (Pa.Cmwlth. 2004).

Accordingly, based on the Commission's determination that SEF projects were a demonstrable benefit to distribution ratepayers, that the General Assembly authorized the continued funding, that SEF funding was not a tax, hidden or otherwise, but a conservation program directly related to conservation programs that the General Assembly permitted to be funded, the Commission's decision for continued funding of the SEF program is affirmed.

## B.

### CEO's APPEAL

#### OnTrack Funding

■ OnTrack is PPL's customer assistance program for low income customers. PPL has proposed a 25.6% annual increase in OnTrack funding—from $11.7 million to $14.7 million which will allow an enrollment of between 15,000 to 17,000 customers by 2007. Pursuant to its 1998 restructuring settlement agreement, PPL has

---

30. SEF, as an intervenor, explains in its brief why SEF is directly related to the distribution system:

First, energy conservation and demand management projects funded by SEF benefit the distribution system by reducing customer load or shifting that load to lower-peak periods, thus, reducing the loading and stress on the distribution system extending its life and ending or delaying the need for expensive distribution system up-

grades. SEF ST. No.1 at 13; R. 259a. The *distribution* benefits of energy conservation and demand management are widely recognized. A summary of these benefits is presented in a report entitled *Portfolio Management: How to Procure Electricity Resources to Provide Reliable, Low–Cost, and Efficient Electricity Services To All Retail Customers,* portions of which appear in the evidentiary record at pages 13 through 15 of SEF Statement No. 1. R. 259a-R.261a.

proposed that $3 million of the funding be "ramped up" by increasing annual spending by $1 million per year through 2007, with the difference in ratepayer funds collected and spent in 2004–2007 escrowed to permit higher expenditures in the years 2008–2010. The OCA proposed limiting any increase in OnTrack funding to $13.2 million which is the average of the amounts PPL proposed to spend in 2005 and 2006 or the first two years of PPL's "ramp-up" period. The OCA argued that the reduced funding was appropriate because PPL could file another base rate case in two years and it only has expenditure plans for the "ramp up" period and proposes to escrow the remainder. Additionally, there was testimony that the "ramp-up" period was consistent with the successful approach agreed to by the parties in PPL's 1998 restructuring settlement and reflected the challenges of expanding the program.

The CEO argued that PPL's proposed increase was not enough and requested more money from ratepayers to enroll up to 100,000 more customers, but did not document the need for 100,000 more enrollees and did not specify the amount of additional funding needed. Because no one objected to the increase in funds and the CEO could not provide specifics to support its argument, the ALJ recommended that the Commission adopt the OCA's adjusted amount, but impose the condition that excess funding be held in an interest-bearing escrow account.

PPL and the CEO filed exceptions to the ALJ's recommendation contending that the proposed 25.6% increase should be granted because the proposed "ramp up" period is needed for community organizations delivering OnTrack to cover ad-

ministrative costs while increasing enrollment by over 30%. PPL and the CEO also argued that if it did not file another rate case within two years, the program would be underfunded and low income customers might be denied program benefits.

The Commission adopted the ALJ's recommendation regarding the two-year normalization for OnTrack expenses stating: "PPL has stated that it will file its next base rate case in two years, and has claimed a two-year normalization period for rate case expense. The increased spending levels for Year 2007 and beyond can be addressed in the next base rate case. Therefore, PPL's Exceptions on this issue are denied." (Commission's December 22, 2004 decision at 41.)

Addressing the issue of OnTrack Funding, the CEO argues that the Commission erred by failing to address in its decision the inadequate funding levels of PPL's proposed OnTrack Funding program. It contends that in June 2003, the Commission previously found that the program was inappropriately funded as required by the Competition Act's Declaration of Policy.[31] Specifically, the CEO contends that in the Commission's June 2003 order, it determined that an appropriate enrollment number was to be no lower than 17,000 and possibly as high as 30,000. However, PPL ignored the order and proposed an enrollment of only 15,000 to 17,000 by the year 2007. Despite PPL's blatant disregard of the Commission's order, neither the ALJ nor the Commission addressed the inappropriateness of PPL's proposed OnTrack program. The CEO is requesting that PPL be directed to increase its enrollment levels to 30,000 low income customers for its OnTrack programs.

---

31. The policy provides: "The Commonwealth must, at a minimum, continue the protections, policies and services that now assist customers who are low income to afford electric service." Section 2802(10) of the Competition Act, 66 Pa.C.S. § 2802(10).

Both the Commission and PPL point out that while the CEO criticizes PPL's proposed program, the CEO has not offered any specific funding plan of its own. Further, the Commission contends that it has continually maintained active oversight of the universal service programs, and the CEO is incorrect that it is sanctioning changes in the plan that are in conflict with its June 2003 order. The Commission points out that in its June 2003 order, it did not agree that PPL had to meet an enrollment of 30,000. Having reviewed that order, we agree.

The June 2003 order provides:

The Commission determines that, based on consideration of all the data and reports, *an appropriate enrollment number should be no lower than the 17,000* enrollment slots approved by the Commission in 2000 when there was 75,000 overdue low income customers, and *possibly as high as 30,000,* the number of enrollment slots recommended in the independent third-party evaluation report submitted pursuant to 52 Pa.Code § 54.74. (Emphasis added.)

Commission's June 13, 2003 order. Here, we find no fault with the Commission's current order allowing a two-year "ramp-up" approach which would allow an enrollment of between 15,000 to 17,000 customers by 2007. Although the Commission stated in its 2003 order that an appropriate enrollment number *should* be no lower than 17,000 and *possibly as high as 30,000,* it is entitled to great deference in the performance of its duties. Its interpretation of the Competition Act should not be overturned unless it is clear that its construction is erroneous. *George.* Because the Commission is not allowing PPL to shirk its duties regarding the program and is still monitoring PPL and the program, and the CEO has offered no alternative

funding plan, the Commission's order is affirmed on this issue.

Accordingly, the order of the Pennsylvania Public Utility Commission dated December 22, 2004, is:

1) vacated as to the appeals by PPLICA and the OSBA regarding the issue of the Distribution and Transmission Service Charges and is remanded to the Commission to set non-discriminatory reasonable rates and rate structure for each service;

2) reversed as to allowance of reimbursement of Hurricane Isabel costs to PPL; and

3) affirmed regarding the appeal by PPLICA regarding the SEF funding and the appeal by the CEO regarding the OnTrack program.

Judge SMITH–RIBNER dissents only to the portion of the majority opinion and order that affirms the Public Utility Commission's decision regarding the OnTrack Program.

### ORDER

AND NOW, this *4th* day of *August,* 2006, the order of the Pennsylvania Public Utility Commission, dated December 22, 2004, is:

1) vacated as to the appeals by PPLICA and the OSBA regarding the issue of the Distribution and Transmission Service Charges and is remanded to the Commission to set non-discriminatory reasonable rates and rate structure for each service;

2) reversed as to allowance of reimbursement of Hurricane Isabel costs to PPL; and

3) affirmed regarding the appeal by PPLICA regarding the SEF funding

and the appeal by the CEO regarding the OnTrack program.

Jurisdiction is relinquished.